1
2
3
4
5
6
7

8                            UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ERIC GALLARDO,                              Case No.  1:23-cv-01616-KES-HBK (HC)

12              Petitioner,                      FINDINGS AND RECOMMENDATIONS TO
                                                 DENY PETITIONER RELIEF ON HIS
13        v.                                     PETITION FOR WRIT OF HABEAS
                                                 CORPUS[1]
14   MATTHEW McVAY,
                                                 FOURTEEN-DAY OBJECTION PERIOD
15              Respondent.
                                                 (Doc. No. 1)
16

17

18        I.      STATUS

19             Petitioner Eric Gallardo ("Petitioner" or "Gallardo"), a state prisoner proceeding with

20   counsel, has pending a petition for writ of habeas corpus filed under 28 U.S.C. § 2254 on

21   November 15, 2023.  (Doc. No. 1, "Petition").  Petitioner challenges his conviction after a jury

22   trial for second degree murder with firearm specifications.  (Case No. F16900466).  (Doc. No. 12-

23   16 at 2; *see* Doc. No. 12-2 at 95-96).[2]   The Fresno County Superior Court sentenced Petitioner to

24   an aggregate term of 40 years to life in state prison.  (Doc. No. 12-16 at 2; *see* Doc. No. 12-2 at

25   245-46).

26   ───────────────────
     [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
27   (E.D. Cal. 2025).

28   [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
     and Electronic Case Filing ("CM/ECF") system.

On appeal, the Fifth Appellate District conditionally reversed Petitioner's sentence and remanded the case to the trial court to consider whether a firearm enhancement should be struck or modified, or whether the original sentence should be reinstated. (Case No. F079072). (Doc. No. 12-16 at 39). The appellate court otherwise affirmed the judgment. (*Id.*). On August 17, 2022, the California Supreme Court denied Gallardo's petition for review. (Case No. S275129). (Doc. No. 12-18).

The instant Petition advances the following three grounds for relief:

(1) Defense counsel was ineffective in not objecting to the improper closing argument and deadlock breaking instructions, in violation of petitioner's Sixth Amendment right to the effective assistance of counsel.

(2) The prosecutor engaged in prejudicial misconduct during closing argument, depriving Petitioner of a fair trial in violation of his Fourteenth Amendment right to due process, when the prosecutor (a) misstated the law concerning the "heat of passion" necessary to reduce murder to manslaughter; (b) vouched for her own credibility and good faith, using the court as a silent witness to this, and misstating the law as to the court's function; and (c) disparaging the defense and falsely accusing defense counsel of trickery and dishonesty.

(3) The court deprived petitioner of his Sixth and Fourteenth Amendment right to a unanimous jury and a fair trial by giving the jury a coercive deadlock-breaking instruction.

(Doc. No. 1 at 18).[3]

Respondent filed an Answer (Doc. No. 13), arguing Petitioner was not entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 12, 12-1 through 12-18, 25[4]). Petitioner filed a traverse.[5] (Doc. No. 23). This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned

---

[3] In response to Respondent's assertion that the prosecutorial misconduct claims are procedurally defaulted, Petitioner clarifies in his traverse that he is "not raising the prosecutorial misconduct issue as a freestanding claim apart from ineffective assistance of trial counsel." (Doc. No. 23 at 2). However, because discussion of the underlying prosecutorial misconduct claim is relevant to the resolution of the ineffective assistance claim, the undersigned discusses the issues separately.

[4] As directed by the court, Respondent supplemented the record with the missing pages of Volume 8 of the Reporter's transcript (Doc. No. 12-11).

[5] Petitioner's traverse largely focuses on whether certain claims were procedurally defaulted and reasserts arguments raised in the initial Petition. (*See* Doc. No. 23-1). Because the undersigned's recommendation addresses the merits of the claims, further discussion of Petitioner's traverse is not warranted.

1    recommends the district court deny Petitioner relief on his Petition and decline to issue a

2    certificate of appealability.

3    **II.    GOVERNING LEGAL PRINCIPLES**

4    **A.    Evidentiary Hearing**

5    In deciding whether to grant an evidentiary hearing, a federal court must consider whether

6    such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

7    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

8    (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise

9    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

10    Here, Petitioner argues "the state courts unreasonably determined the facts by not holding

11    an evidentiary hearing at which defense counsel could be questioned on his reasons, if any, for

12    failing to object" such that Petitioner is entitled to an evidentiary hearing in these federal

13    proceedings. (Doc. No. 1 at 19). However, as discussed below in addressing the merits of

14    Petitioner's claims, any objection would have been meritless and, even if defense counsel

15    performed deficiently, the record does not show that Petitioner was prejudiced. Thus, counsel's

16    reasons for failing to object are immaterial to the issues before the Court. This Court finds that

17    the pertinent facts of this case are fully developed in the record before the Court and no

18    evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

19    **B.    ADEPA General Principles**

20    A federal court's statutory authority to issue habeas corpus relief for persons in state

21    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

22    Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to

23    first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If

24    the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

25    of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

26    the merits, then AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*,

27    136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a

28    claim adjudicated on the merits, but only if the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362, 407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

4

1   *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

2   merely because the federal habeas court would have reached a different conclusion in the first

3   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

4       Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

5   constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

6   *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

7   AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

8   prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

9   petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

10  precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

11  112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails

12  to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has

13  cleared both tests." *Id.* at 134.

14      As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

15  an "adjudication on the merits" in state court. An adjudication on the merits does not require that

16  there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

17  at 98. "When a federal claim has been presented to a state court and the state court has denied

18  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

19  of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

20  may be overcome when there is reason to think some other explanation for the state court's

21  decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

22  discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

23  289, 293, 298-301 (2013).

24      While such a decision is an "adjudication on the merits," the federal habeas court must

25  still determine the state court's reasons for its decision in order to apply the deferential standard.

26  When the relevant state-court decision on the merits is not accompanied by its reasons,

27          the federal court should "look through" the unexplained decision to
            the last related state-court decision that does provide a relevant
28          rationale. It should then presume that the unexplained decision

1

2

3

> adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

4

5

6

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id.* at 1196.

7

### III.    RELEVANT FACTUAL BACKGROUND

8

9

10

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

11

### BACKGROUND

12

13

14

15

16

> It was undisputed at trial that appellant shot and killed [Anthony Leon] Jones. The fatal incident was captured on surveillance video and played for the jury. The prosecutor argued for first degree premeditated murder. The defense asserted that appellant did not commit murder. According to the defense, appellant acted either in self-defense, or under a heat of passion, or in imperfect self-defense. The jury rejected the competing positions and found appellant guilty of second degree murder.

17

> **I.    The Murder.**

18

19

20

> Appellant did not know Jones, and he had never seen him before. Appellant shot Jones to death on January 23, 2016. This shooting occurred near the entrance to a small store located in the County and City of Fresno.

21

22

23

24

25

26

> As seen in the video, appellant and Jones briefly exchanged blows just prior to the fatal shots. It was appellant who initiated the brief physical encounter. Appellant punched Jones, who appeared to either punch back or attempt to deflect appellant's blow. After being struck by appellant, Jones stumbled towards a wall but he remained standing. At the same time, appellant stepped back several paces and he retrieved a handgun which he had concealed under his shirt. Appellant, who was standing just outside the open front doors to the store, fired multiple shots at Jones, who was standing just inside the store. Appellant fired just as Jones took a step towards him. Jones never displayed a weapon, and he fell to the ground inside the store. Eyewitnesses saw appellant run away, and he got into a car and sped off.

27

28

> Before appellant fired, eyewitnesses heard him yelling at Jones. According to one eyewitness, appellant had asked Jones why he had

touched his daughter, or why he had talked to his daughter. Another eyewitness heard appellant say, "come on, mother fucker." Appellant pulled out a gun and began to shoot.

## II.    The Forensic Evidence

Emergency personnel responded and Jones was transported to a hospital. He died a short time later.

Law enforcement located five spent shell casings around the area where appellant had fired his handgun. Two expended bullets were recovered inside the store. Law enforcement never found a weapon near Jones or anywhere inside the store.

An autopsy revealed that appellant's shots struck Jones three times. The cause of death was "perforation of the left lobe of the liver and aorta due to [a] gunshot wound to the abdomen."

## III.    Just Prior to this Shooting, the Victim had Interacted with Appellant's Wife.

The jury learned that this fatal shooting stemmed from a negative interaction between Jones and appellant's wife, Rosalinda. The negative interaction between Jones and Rosalinda occurred earlier that same day.

According to Rosalinda, she had been visiting her relatives at a residence that was down the street from the store in question. She arrived there sometime around 4:00 p.m. That same afternoon, Jones came into the residence. According to Rosalinda, Jones had "reeked of alcohol." He sat right next to her on a couch.

Rosalinda told the jury that Jones acted inappropriately with her. Her daughter, who was about 18 months old at the time, was fussy and crying. The baby was resting on a reclining chair nearby. At some point, Jones pushed Rosalinda on her shoulder, telling her to "get" the baby, who continued to cry. About 30 seconds later, Jones "shoved" Rosalinda again harder with his elbow. He again told Rosalinda to get the baby. She told the jury that Jones had sounded "more serious this time." She believed that Jones was getting more irritated because the baby was crying.

Rosalinda testified that, at some point, Jones "kicked the couch" on which the baby was resting. This startled the baby, who began to cry more. Rosalinda stood up. When she did, Jones pinched her butt. She told the jury that he did so "in the center" of her butt towards her "butthole." She said it felt like he had touched her anus.

Rosalinda testified that she "got scared" and she was "startled." She explained that she was scared because Jones had "violated" her and he had scared her daughter. She did not know "what else he was going to do."

Jones went into the backyard for a short time. Rosalinda told her aunt what had happened. She said that somebody had better talk to

7

Jones "before I call [appellant] over here." At trial, she agreed that appellant had protected her throughout her entire life.

Rosalinda's aunt confronted Jones about what had happened. The aunt asked Jones to leave, but he remained for about 10 minutes. According to Rosalinda, Jones kept staring at her. She believed he was staring at her breasts. This made her feel uncomfortable and afraid. She testified that she got "like an ugly feeling" in her stomach "like if he was going to attack me." She described Jones as "pretty stocky." At some point, Rosalinda told Jones that she was calling appellant. He told her to go ahead and call whomever she wanted.

## IV.    Rosalinda Called Appellant and Told Him About Jones's Behavior.

Rosalinda called appellant. She was crying. She testified that she was scared and was "kind of like hyperventilating, you know, like I couldn't control my emotions." According to Rosalinda, she told appellant that she had been pinched and grabbed on her ass. She told him it was a friend of her aunt and mom who did this. The man was known as "Chicken," but she did not know him. She said that Chicken had also kicked at their youngest daughter. She asked appellant to come over, saying she needed his help. Appellant asked her how Chicken had touched her and she said, "he touched me on my butt, like he pinched me on my butt." She told him, "I just don't feel comfortable" and "can you come over." She told the jury that she called appellant so he could protect her.

Before appellant arrived, Jones came up to Rosalinda outside the residence and he tried to hug her. She backed away from him. According to Rosalinda, Jones shrugged his shoulders and was like, "Well, fuck you then." Jones walked down the street.

One of Rosalinda's aunts testified at trial that she and her sisters tried to talk to Jones. She knew him, but he did not want to talk to her. The aunt asked Jones to apologize "because it's foul what you did." According to the aunt, Jones did not apologize but instead "attacked" or "grabbed" Rosalinda again. The aunt heard Jones say, "Hey, I'm sorry, I've been drinking."

## V.    Appellant Arrives and Rosalinda Tells him Where Jones Went.

Before appellant arrived, Rosalinda received a text message from appellant. He wrote, " 'I'm—I'm just going to beat him up.' " Appellant arrived about 20 minutes after Rosalinda had called him. She met him outside the house. She said a lot of family members were also outside, and it was very emotional. Everybody was talking about everything that had happened. Rosalinda testified that she was "hysterical" and crying. Appellant asked her where Chicken was and she told him that he was down at the store.

Appellant began walking "fast" down the street towards the store. He was wearing shoes that he loved, but he walked through "a big

puddle of water." This surprised Rosalinda and it appeared "weird" to her because he always took care of those shoes. She then heard gunshots. She saw appellant get into his vehicle and "take off."

Rosalinda agreed at trial that, when appellant had arrived, she had pointed out the direction where Jones was and she had assumed appellant was going to protect her. She told the jury it was not okay for somebody to scare her daughter and then touch her like that. She said, "I would assume that anybody would feel threatened." She told the jury that she knew appellant had firearms. However, she claimed that she had not known that he had been armed when he confronted Jones.

**VI.    Appellant's Statements to Rosalinda after this Shooting.**

Before law enforcement located appellant and arrested him, Rosalinda talked to him and he told her what had happened. According to Rosalinda, appellant said he got to the store and he had asked, "Who's Chicken?" Jones had started laughing and he told appellant, "I'll get to you in a minute." Appellant told Rosalinda that he got mad and they started fighting. Appellant told Rosalinda that he thought Jones had hit him on his face with a bottle. Appellant said he had "blacked out" and "just started shooting." Appellant admitted to Rosalinda that he had shot Jones.

**VII.    Appellant's Statements to Detectives.**

On January 25, 2016, law enforcement located appellant in the Stockton area. He was taken into custody without incident. Late that night, two detectives interviewed him. The interview was recorded with both audio and video. The recorded interview was played for the jury.

Appellant stated that he did not confront Jones with an intent to kill. Instead, he only wanted to fight. According to appellant, he brought along a firearm because he did not know Jones and he was concerned that Jones might be armed. Appellant said he shot Jones because he became "scared" after the initial exchange of blows. Appellant said that Jones was big. Appellant thought Jones might have hit him with a bottle. Appellant also stated he thought Jones had been "reaching" for something. Appellant claimed he had "blacked out" just before he began shooting. Appellant said he shot because "I got scared." When asked what Jones had done to make him scared, appellant simply responded that he "blacked out." He later told the detectives that he has a quick temper. "It takes a lot to get me mad but once I'm mad I lose it. I black out. I've been like that ever since I was little." He said that other occasions had occurred where he has blacked out and he could not remember what he did.

Appellant was reluctant to identify Rosalinda as the person who had called him. Appellant initially said that "Tia" had called him, telling him that someone had been touching his kids and had "grabbed her and pushed her and he was feelin' on her." Appellant told the detectives that he did not get "the whole story" but he just knew

1    that his "kids were in danger and I had to get there."

2    Later, appellant made statements from which it can be inferred he
     was describing Rosalinda as the person who had informed him
3    about Jones's actions. He told detectives that she had sounded
     "hurt" and "scared." A little later appellant stated it was his
4    understanding that his baby had been crying and Jones "kept telling
     her" to get the baby. Jones had approached "her" and "I guess
5    grabbed" her. According to appellant, Rosalinda had told Tia that
     Jones kept "disrespecting" her, and he "did it again."
6
     Appellant agreed with a detective who summarized that Jones had
7    "grabbed" Rosalinda's "ass." Appellant clarified that "the aunt" did
     not see the incident, but Rosalinda had told everyone that Jones was
8    making her "so uncomfortable." Jones was much older and kept
     doing "stuff" that she did not want. Appellant agreed that he
9    thought Jones had touched Rosalinda in an "inappropriate way." It
     was appellant's understanding that Jones had "grabbed" her "on the
10   side" but he did not know if it was done for sexual gratification.
     Later, appellant said he thought Jones had been "fondling my
11   child."

12   The detectives reviewed the surveillance video with appellant, who
     stated that he remembered telling Jones that he could "never again"
13   touch his daughter. Appellant agreed that Jones had hit him in his
     mouth. Appellant initially thought Jones might have hit him with a
14   bottle because it did not feel like a punch. After reviewing the
     footage, appellant expressed surprise that Jones had hit him with a
15   fist. Appellant stated that, from his perspective, he had not known
     what was on the store's counter or what Jones might have grabbed.
16   Appellant, who was wearing braces when this fight occurred,
     realized that his braces could have caused it to feel more than a
17   punch.

18   Appellant told the detectives that he had not wanted to "go over
     there" after Rosalinda had called him. He denied that he had been
19   afraid, and stated he had not known "that was gonna [*sic*] happen."
     He agreed he had only intended to fight Jones. A short time later,
20   appellant said he "made a big mistake." Even later, appellant said
     that Jones "didn't deserve" what happened. Appellant reiterated
21   that he had "blacked out."

22   (Doc. No. 12-16 at 2-10).

23   **IV.    ANALYSIS**

24       As an initial matter, Petitioner recognizes that his trial counsel failed to object to the

25   alleged prosecutorial misconduct or the deadlock breaking instruction.  (Doc. No. 1 at 18-19).

26   Accordingly, Petitioner indicates he raises these issues through the vehicle of his ineffective

27   assistance claim.  (*Id.*).  Respondent argues first that the prosecutorial misconduct and jury

28   coercion claims are procedurally barred based on defense counsel's failure to object but,

1    alternatively, were reasonably rejected on the merits.  (*See* Doc. No. 13 at 8).  While the state

2    court did note that the failure to object alone was sufficient reason to deny Petitioner's claims, it

3    alternatively found that each claim failed on the merits.  (*See* Doc. No. 12-16 at 10-34).  This

4    court declines to address the procedural bar and instead determines the claims fail on the merits.

5    *See Flournoy v. Small*, 681 F.3d 1000, 1005 n.1 (9th Cir. 2012) (where California Court of

6    Appeal "deemed any challenge waived under the state's contemporaneous objection rule" but

7    proceeded to discuss the merits of the claim, denial of § 2254 claim on the merits was appropriate

8    because while courts "ordinarily resolve the issue of procedural bar prior to any consideration of

9    the merits on habeas review, [they] are not required to do so when a petition clearly fails on the

10   merits").

11       Because Petitioner's ineffective assistance claim relies on the substance of his other

12   claims, the undersigned first addresses the prosecutorial misconduct and jury coercion claims

13   before turning to Petitioner's ineffective assistance claim.

14       **A.    Ground Two-Prosecutorial Misconduct**

15       Petitioner argues the prosecution engaged in prejudicial misconduct during closing

16   argument by:  (1) misstating the law concerning the "heat of passion" defense; (2) improperly

17   vouching for her own credibility and good faith by using the court as a silent witness and

18   misstating the law as to the court's function; and (3) disparaging the defense function by falsely

19   accusing defense counsel of trickery and dishonesty simply because he referred to the prosecutor

20   as "the government."  (Doc. No. 1 at 21-29).

21       **1.   State Court Decision**

22       The state appellate court considered and ultimately rejected Petitioner's prosecutorial

23   misconduct claims as follows:

24           *A. Background.*

25           Appellant's claim of prosecutorial misconduct is based on three
             separate concerns. First, he contends the prosecutor misstated the
26           law regarding heat of passion. Second, he asserts the prosecutor
             improperly vouched for her own credibility. Finally, he maintains
27           the prosecutor improperly disparaged defense counsel. We
             summarize the prosecutor's disputed comments.

28

1      **1. The prosecutor's disputed comments regarding heat of passion.**

2

3      During her closing arguments, the prosecutor urged the jury to find appellant guilty of first degree premeditated murder. She contended that appellant purposefully armed himself with a loaded weapon to bring to this fight "if he needed it." She argued that he quickly reached a "cold and calculated" decision to kill.

4

5      The prosecutor argued to the jury that the facts did not establish a heat of passion. We highlight in italics the disputed comments the prosecutor made regarding heat of passion. She asserted that a heat of passion defense "boils down to" whether or not appellant "*was so out of it he couldn't control himself*." She noted that the provoking event was appellant's conversation with Rosalinda. The prosecutor questioned whether it was sufficient that Rosalinda "had been groped in the buttock" and that someone was "kicking at" appellant's child. "Is that enough to have *caused a reasonable person to be so out of their mind that they would then kill someone*?"

6

7

8

9

10

11

12     A short time later, the prosecutor asked the jury if it was reasonable that appellant had fought with Jones and shot him "because he was so overcome with emotion and feelings that he just—he's not responsible for what happened next because *he wasn't in his right mind.* Would a reasonable person act like that?"

13

14

15     The prosecutor argued it took appellant at least 20 minutes to drive across town to meet Rosalinda after she had called him, and he shot Jones minutes later. According to the prosecutor, appellant had time to "take a breath, to turn in the opposite direction, to call the police if he really thinks that something was going down, to do something other than what he did, but look at what he did. *He's not so out of his head* with emotion that he's not thinking through his plan. He has—he goes and makes sure he has a firearm, makes sure it's loaded, and he gets himself all the way down there. He thought this through. And the fact that he was able to take that kind of time to think about what he was going to do next, that shows you this thought process and deliberation that *he's not so out of his mind at all*. [¶] He's making decisions. They may not be the decisions that you and I would make, but he's making decisions, nonetheless, which shows this thought process and deliberation, which means that he wasn't so overcome with emotion."

16

17

18

19

20

21

22

23     The prosecutor reminded the jurors that appellant had expressed to the detectives that he had not wanted to drive over to meet Rosalinda after she had called him, but he went anyway. According to the prosecutor, this showed that "*he's not out of his mind* in this uncontrollable rage or emotion. He's thinking this through."

24

25

26     Finally, in her rebuttal argument, the prosecutor stated that "[h]eat of passion is, I *was so out of my mind that I didn't know what I was doing*."

27

28

1

**2. The prosecutor's disputed comments regarding her credibility and the defense.**

2

During rebuttal argument, the prosecutor complained that defense counsel had "routinely" referred to her as "the Government." The prosecutor reminded the jurors that the court had informed them two weeks before that she was "the People" or "the D.A's office" or she was referred to by name. According to the prosecutor, the defense's reference to her as the government was a "common trick" by the defense to "evoke some emotion in you" about the prosecution.

3

4

5

6

7

A short time later during rebuttal, the prosecutor responded to a defense argument that she had failed to call logical civilian witnesses. She assured the jury that, if she had done something improper or wrong, "you would have heard from the judge." Immediately thereafter the prosecutor characterized defense counsel's argument as "another trick. It's dishonest and it's certainly not straightforward."

8

9

10

11

**B. Standard of review.**

12

The Fourteenth Amendment of the United States Constitution is violated if a prosecutor's misconduct infects a trial with such unfairness that the conviction is a denial of due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009.) In other words, the misconduct must be of sufficient significance as to deny the defendant's right to a fair trial. (*Ibid.*) California law is violated if a prosecutor uses deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Id.* at pp. 1009–1010.) However, a defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*Id.* at p. 1010.)

13

14

15

16

17

18

**C. Analysis.**

19

20

Respondent concedes that, at one particular point during closing argument, the prosecutor misstated the law regarding heat of passion. Respondent, however, argues that reversal is not required due to forfeiture and a lack of prejudice. Respondent contends that no other misconduct occurred.

21

22

We agree with respondent and we reject appellant's arguments. We determine that appellant has forfeited each of these claims. In the alternative, we conclude that any misstatement of law was harmless, and no other misconduct occurred. We find any other presumed error to be harmless.

23

24

25

**1. Appellant's claims are forfeited.**

26

As a rule, a claim of prosecutorial misconduct is forfeited if the defense fails to object and request an admonition to cure any harm. (*People v. Centeno* (2014) 60 Cal.4th 659, 674; *People v. Tully*, *supra*, 54 Cal.4th at p. 1010.) Our Supreme Court makes it clear

27

28

13

1   that a claim of prosecutorial misconduct will not be deemed
    forfeited "only when 'an objection would have been futile or an
2   admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54
    Cal.4th 908, 937.) As the high court has stated, "we see no reason
3   to carve out an exception to the general rule that a defendant must
    object to misconduct at trial to raise the claim on appeal.
4   [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 762
    [addressing claim that the prosecutor improperly suggested the
5   responsibility for a death verdict rested elsewhere].)

6   The parties agree that appellant did not object below to any of the
    purported prosecutorial misconduct. This record does not support a
7   finding that the defense was excused from the obligation to raise an
    objection to preserve this claim for appeal. "The trial atmosphere
8   was not poisonous, defense counsel did not object at all, and the
    record fails to suggest that any objections would have been futile."
9   (*People v. Riel* (2000) 22 Cal.4th 1153, 1213; accord, *People v. Hill*
    (1998) 17 Cal.4th 800, 820–821.) Appellant "fails to show how
10  objecting would have been futile under the circumstances of this
    trial. Consequently, his claims are forfeited." (*People v. Williams*
11  (2013) 56 Cal.4th 630, 672.)

12  To overcome forfeiture, appellant raises a claim of ineffective
    assistance of counsel. This is without merit. Our Supreme Court
13  holds that a failure to object to argument seldom establishes
    counsel's incompetence. (*People v. Ghent* (1987) 43 Cal.3d 739,
14  772.) Defense counsel "may well have tactically assumed that an
    objection or request for admonition would simply draw closer
15  attention to the prosecutor's isolated comments." (*Id.* at p. 773.)

16  In any event, we determine below that any error was harmless
    stemming from the prosecutor's various disputed comments. As
17  such, because appellant cannot demonstrate prejudice, any failure
    by trial counsel to object did not constitute ineffective assistance.
18  (See *People v. Lucas* (1995) 12 Cal.4th 415, 436 [defendant bears
    burden to establish both deficient performance and resulting
19  prejudice in a claim of ineffective assistance of counsel].) For these
    reasons, the various claims of prosecutorial misconduct are
20  forfeited.

21          **2.    Prejudice did not occur from the prosecutor's
                    arguments regarding heat of passion.**
22
    Although we accept respondent's concession that the prosecutor
23  made a misstatement of law during closing argument, we also agree
    that none of the prosecutor's disputed comments regarding heat of
24  passion resulted in prejudice. Heat of passion is not a true defense
    to murder. Instead, it is the basis for the crime of voluntary
25  manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 199.) "A
    killing that would otherwise be murder is reduced to voluntary
26  manslaughter if the defendant killed someone because of a sudden
    quarrel or in the heat of passion." (CALCRIM No. 570; see also §
27  192, subd. (a).)

28  Three elements are required to establish voluntary manslaughter

14

based on a heat of passion: (1) the defendant was provoked; (2) as a result of the provocation, the defendant "acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;" and (3) the provocation would have caused a person of average disposition to act rashly and without due deliberation; in other words, "from passion rather than from judgment." (CALCRIM No. 570.)

In *People v. Beltran* (2013) 56 Cal.4th 935, our Supreme Court rejected an argument that "provocation must be of a kind that would cause an ordinary person of average disposition *to kill*." (*Id.* at p. 938.) Instead, heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Id.* at p. 942.)

In this matter, respondent concedes that, at one point, the prosecutor equated heat of passion as whether provocation would have moved a reasonable person *to kill*. Based on *People v. Beltran*, respondent agrees that the prosecutor misstated the law in this regard. We accept respondent's concession that this was a misstatement of law.

The parties, however, dispute whether or not the prosecutor improperly equated heat of passion with legal insanity. Appellant contends that the prosecutor's comments informed the jury that appellant had to be "legally insane" for voluntary manslaughter to apply. In contrast, respondent argues that the prosecutor never used the word "insanity" and the jury was not instructed on the legal standard for insanity.

We need not resolve the parties' dispute regarding whether or not the prosecutor equated a heat of passion with legal insanity. We also need not analyze whether or not the prosecutor's other comments represented a misstatement of law. Instead, we determine that any presumed error was harmless.

To establish prejudice, appellant notes that the jury was deadlocked regarding whether he was guilty of second degree murder or manslaughter. He argues the deadlock "must have been over the issue of provocation and heat of passion." He contends that the evidence was "very strong" to establish provocation. Appellant asserts that the jury would not have known to examine the differences between the trial court's instructions and the prosecutor's comments regarding provocation. He contends reversal is required.

We disagree that prejudice occurred. Our Supreme Court has noted that arguments from counsel are generally considered to carry less weight with a jury than instructions from the trial court. (*People v. Centeno*, *supra*, 60 Cal.4th at p. 676.) We are to presume that a jury will treat a prosecutor's comments as words spoken by an advocate in an attempt to persuade while the court's instructions are viewed

as binding statements of law. (*Ibid*; accord, *People v. Seaton* (2001) 26 Cal.4th 598, 646.)

In this matter, the trial court instructed the jury to follow its legal instructions to the extent the attorneys' comments were in conflict. The trial court properly instructed the jury regarding the elements necessary to find appellant guilty of voluntary manslaughter. Indeed, appellant concedes that the court "correctly described" the type of provocation required to reduce murder to manslaughter pursuant to a heat of passion. The court informed the jurors that voluntary manslaughter was appropriate if (1) appellant was provoked and (2) as a result of the provocation he "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;" and (3) the provocation "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

We presume that the jury followed the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Because the jury received proper instructions from the trial court, which we presume were followed, any misstatements of law from the prosecutor were rendered harmless. (See *People v. Pearson* (2013) 56 Cal.4th 393, 440 [finding harmless a prosecutor's misstatement of law because the jury was presumed to have relied on the proper instructions from the court].)

Moreover, any presumed error is harmless because the evidence of appellant's intent to commit murder was overwhelming. The video showed him initiating a fist fight with Jones. After Jones fell against a wall inside the store, appellant reached for a handgun which he had concealed under his shirt. Appellant fired multiple times as Jones took a step towards him. Jones never displayed a weapon and law enforcement never recovered a weapon in the market. The evidence conclusively established appellant's express malice to commit murder.

In addition, although the jury was deadlocked for a time, this record does not reasonably support a finding of voluntary manslaughter based on a heat of passion. "The heat of passion requirement for manslaughter has both an objective and subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The defendant must actually kill in the heat of passion, and the circumstances giving rise to that passion must be such that they would arouse passion in the mind of a reasonable person. (*Ibid.*) However, the passion aroused cannot be based on revenge. (*People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Burnett* (1993) 12 Cal.App.4th 469, 478; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704 ["desire for revenge does not qualify as a passion that will reduce a killing to manslaughter"].)

Here, the circumstances overwhelmingly demonstrate that appellant confronted Jones to either protect his family or to get revenge. The prosecution established that it took appellant about 20 minutes to drive to meet Rosalinda after she called him. On his way to meet Rosalinda, appellant texted that he was going to "beat" Jones. Once

appellant arrived, he walked down the street to the store.

During his interview with the detectives, appellant emphasized that he did not confront Jones with an intent to kill. Instead, he only wanted to fight Jones. According to appellant, he brought along the firearm because he did not know Jones and he was concerned that Jones might be armed. Appellant said he shot Jones because he became "scared" after the initial exchange of blows. Appellant thought Jones might have hit him with a bottle. Appellant also stated he thought Jones had been "reaching" for something. Appellant claimed he "blacked out" at that point.

The events surrounding Jones's killing do not reflect the temporal connection between provocation and appellant's act of shooting that commonly negates malice. Instead, there was time for appellant's emotions to cool and it is apparent that he exercised judgment regarding when and how he would confront Jones. Indeed, appellant did not approach Jones with his handgun drawn and appellant did not shoot him right away. The evidence does not reasonably establish that appellant killed Jones under a subjective heat of passion. (See *People v. Steele*, *supra*, 27 Cal.4th at p. 1252 [setting forth requirement for subjective component of heat of passion].) In other words, the record does not reasonably demonstrate that appellant acted without deliberation or judgment, and simply reacted from emotion due to the provocation. (See *People v. Beltran*, *supra*, 56 Cal.4th at p. 950 [setting forth this standard].)

Further, the provocation that occurred in this matter would not have caused a person of average disposition to act rashly and without due deliberation. Rosalinda testified she told appellant that Jones had pinched and grabbed her butt. She also told appellant that Jones had kicked at their youngest daughter. Rosalinda was crying and scared during the phone call. She asked appellant to come over, saying she needed his help. While Rosalinda's phone call would have caused a person of average disposition to become concerned and possibly even angry, such information would not have caused a person of average disposition to act rashly and under the influence of intense emotion that obscured reasoning or judgment. (CALCRIM No. 570.) This record does not support the objective prong necessary to establish a heat of passion.

Finally, the prosecutor's disputed remarks regarding heat of passion were relatively brief and isolated. In comparison, the prosecutor made other arguments that demonstrated a heat of passion was not appropriate. She correctly informed the jury that heat of passion required a defendant to be provoked, and that provocation had to cause a person of average disposition to act "rashly and under the influence of intense emotion that obscured his reasoning or judgment." The prosecutor emphasized that, although appellant had intended to fight Jones, appellant had acted with purpose and deliberation because he had decided to bring a loaded gun with him. She asserted that appellant had time on his drive over to reconsider his actions, but he made decisions along the way that showed his "thought process and deliberation, which means that he wasn't so

overcome with emotion."

Based on the entirety of this record, it is not reasonably probable a result more favorable to appellant would have been reached absent the prosecutor's disputed comments regarding heat of passion. The jury was properly instructed on the law, and the evidence overwhelmingly established murder. Accordingly, reversal is not warranted for this issue, and this claim fails.

### 3. The prosecutor did not improperly vouch for herself and any presumed error was harmless.

Appellant's second issue arose during rebuttal argument to the jury. The prosecutor stated that, if she had done anything improper or wrong, "you would have heard from the judge."

According to appellant, the prosecutor improperly vouched for her own credibility and used the trial court "as a silent witness" when doing so. Appellant also contends that the prosecutor misstated the law regarding the court's function. To establish error, appellant relies primarily on *United States v. Smith* (9th Cir. 1992) 962 F.2d 923 (*Smith*). We reject appellant's arguments.

In *Smith*, the prosecutor assured the jury that the prosecution's key witness could not say "whatever he wanted" as defense counsel had suggested because the witness would be prosecuted for perjury if he did so. (*Smith, supra,* 962 F.2d at p. 928.) The Ninth Circuit held that this remark "constituted the sort of personal and institutional guarantee that the law forbids" because it suggested the prosecutor believed the witness's testimony was true. (*Id.* at p. 933.) The prosecutor further "reinforced this message with repeated comments aimed at establishing his own veracity and credibility as a representative of the government," like stating his job was "not to seek a conviction but rather to guarantee a fair trial and turn over any favorable evidence to the defense," and that " '[i]f I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen.' " (*Id.* at pp. 933–934.) The Ninth Circuit reversed, concluding that the prosecutor's comments as a whole were not invited and "placed the prestige of the law enforcement branch of government behind his conduct of the trial and behind [the witness]'s testimony." (*Id.* at p. 936.) The Ninth Circuit explained that a defendant's right to receive a fair trial is "severely diminished" if a prosecutor may invoke the court as the guarantor of truthfulness when the veracity of a star witness is challenged. (*Ibid.*)

*Smith* is distinguishable from the present matter. Unlike in *Smith*, the prosecutor here did not make repeated comments aimed at establishing her own veracity and credibility as a representative of the government. (See *Smith, supra,* 962 F.2d at pp. 933– 934.) Contrary to *Smith*, the prosecutor did not use the prestige of the trial court to bolster a star witness's credibility. (See *id.* at p. 936.) Instead, as appellant notes in his briefing, it appears the prosecutor made this disputed statement in response to a defense argument that she had failed to call logical witnesses. Unlike in *Smith*, appellant's

1    right to receive a fair trial was not severely diminished. The
     concerns expressed in *Smith* are lacking here, and *Smith* does not
2    mandate reversal.

3    The prosecutor's isolated statement did not constitute improper
     vouching and it did not rise to the level of misconduct. Improper
4    vouching by a prosecutor occurs when she either (1) suggests that
     evidence not available to the jury supports a particular argument, or
5    (2) she invokes her personal prestige or depth of experience, or the
     prestige or reputation of the office, in support of an argument.
6    (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) The prosecutor's
     brief comment did not touch on these concerns.

7

8    Finally, we agree with respondent that any presumed error was
     harmless. Nothing reasonably suggests the jurors would have
9    placed any weight on the prosecutor's extremely brief and isolated
     comment that, if she had done anything wrong, they would have
10   heard from the judge. In any event, the evidence overwhelmingly
     established appellant's guilt for second degree murder.
11   Consequently, it is not reasonably probable a result more favorable
     to appellant would have been reached absent the prosecutor's
12   allegedly improper statement. Therefore, reversal is not warranted
     for this issue.

13            **4.  The prosecutor did not disparage defense counsel**
                   **and any presumed error was harmless.**
14

15   During rebuttal argument, the prosecutor complained that defense
     counsel had relied on a "common trick" to invoke an emotional
16   response in the jurors because he had referred to her as "the
     Government." A short time later during rebuttal, the prosecutor
17   responded to a defense argument that she had failed to call logical
     civilian witnesses. She assured the jury that, if she had done
18   something improper or wrong, "you would have heard from the
     judge." Immediately thereafter the prosecutor characterized defense
19   counsel's argument as "another trick. It's dishonest and it's
     certainly not straightforward."

20   Appellant argues it was inappropriate for the prosecutor to attack
     defense counsel. Appellant cites opinions showing that both state
21   and federal appellate courts regularly use the term "the
     government" to refer to the prosecution. Appellant also contends it
22   was likewise permissible for defense counsel to comment on the
     prosecution's failure to call logical witnesses. Appellant maintains
23   that the prosecutor committed misconduct. We disagree.

24   It is improper for prosecutors to launch personal attacks against
     defense counsel. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.)
25   Misconduct occurs if a prosecutor disparages defense counsel
     before the jury. (*People v. Williams* (2009) 170 Cal.App.4th 587,
26   637.) "If there is a reasonable likelihood that the jury would
     understand the prosecutor's statements as an assertion that defense
27   counsel sought to deceive the jury, misconduct would be
     established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302,
28   disapproved on another ground by *People v. Merritt* (2017) 2

                                        19

Cal.5th 819, 831.) However, "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings*, *supra*, at p. 1302, fn. 47.)

Here, the prosecutor did not accuse appellant's trial counsel of fabricating a defense or factually deceiving the jury. Our Supreme Court has characterized those particular concerns as the "forbidden tactics" which establish misconduct. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1193 [it is misconduct to characterize defense counsel as "liars" or accuse counsel of lying to the jury].) Instead, it appears the prosecutor was attempting to focus the jury away from certain points which the defense had raised.

The prosecutor's comments fall within precedent upheld by our Supreme Court. In *People v. Zambrano*, *supra*, 41 Cal.4th 1082, the prosecutor characterized defense counsel's argument "as a 'lawyer's game' and an attempt to confuse the jury by taking the witness's statement out of context." This did not constitute misconduct. (*Id.* at p. 1154.)

In *People v. Stanley* (2006) 39 Cal.4th 913, it was not misconduct for the prosecutor to tell the jury "that defense counsel 'imagined things that go beyond the evidence' and told them a 'bald-faced lie.' " (*Id.* at p. 952.) The high court held that the prosecutor's remarks were merely responsive to defense counsel's own arguments to the jury on the state of the evidence. (*Ibid.*)

In *People v. Young*, *supra*, 34 Cal.4th 1149, the high court found no misconduct when the prosecutor referred to defense counsel's argument as "idiocy." (*Id.* at p. 1193.) Instead, that it was a "fair comment on counsel's argument." (*Ibid.*)

In *People v. Stitely* (2005) 35 Cal.4th 514, "[t]he prosecutor told jurors to avoid 'fall[ing]' for counsel's argument in favor of a second degree murder verdict, to view counsel's argument as a 'ridiculous' attempt to allow defendant to 'walk' free, to view counsel's statement as an 'outrageous' attempt to demean the victim and treat her as a 'Jane Doe,' and to view counsel's argument as a 'legal smoke screen.' " (*Id.* at p. 559.) Our high court found no misconduct. "The prosecutor simply used colorful language to permissibly criticize counsel's tactical approach. [Citations.] These comments were explicitly aimed at counsel's closing argument and statement, rather than at him personally. We see no improper attack on counsel's integrity." (*Id.* at p. 560.)

In light of Supreme Court precedent, we conclude that the prosecutor's disputed comments here did not amount to misconduct. In any event, we also find any presumed error to be harmless. The disputed remarks were directed against opposing counsel and not against appellant. "The statements came at the conclusion of a lengthy trial in which much evidence was

1
2
3
4
5
6

introduced, and there is little likelihood that the jury was affected by the prosecutor's relatively brief remarks." (*People v. Perry* (1972) 7 Cal.3d 756, 790.) It is likely the jurors gave these comments "little or no consideration. Finally, and perhaps most importantly, the judge instructed the jurors that they had to decide the case on the basis of the evidence received in court and that they could not consider statements of counsel as evidence." (*Id.* at p. 791.) For these reasons, we conclude that this alleged prosecutorial misconduct was not likely to have caused a miscarriage of justice, and "reversal of the judgment is not justified on this ground." (*Ibid.*)

7
8
9
10
11
12

Based on this record, we reject appellant's three grounds of prosecutorial misconduct. Appellant has forfeited these various claims due to a failure to object below and seek an admonition. In any event, the prosecutor did not infect the trial with such unfairness as to make the conviction a denial of due process. Each of the disputed comments either did not constitute misconduct or did not cause prejudice. It is not reasonably probable a result more favorable to appellant would have been reached in the absence of these disputed comments. Accordingly, this claim is without merit and reversal is not required.

13

(Doc. No. 12-16 at 10-25 (footnotes omitted)).

### 2. Federal Habeas Analysis

14
15
16
17
18
19
20
21
22
23

Petitioner advances general arguments as to why he is entitled to relief based on the alleged prosecutorial misconduct. (*See* Doc. No. 1 at 20-29). However, despite recognizing that under AEDPA he is only entitled to relief if the state court's adjudication of a claim was contrary to, or involved an unreasonable application of clearly established law, or was based on an unreasonable determination of the facts, Petitioner wholly fails to advance any argument as to why the state appellate court's decision satisfies this standard. (*See* Doc. No. 1 at 20-29). Respondent argues that even if the prosecutorial misconduct claims are not barred, they fail because "Petitioner identifies no governing Supreme Court precedent that was unreasonably applied to any of his misconduct claims" and "Petitioner has not shown prejudice." (Doc. No. 13 at 16).

24
25
26
27
28

"To decide if improper comments give rise to a constitutional violation, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Michaels v. Davis*, 51 F.4th 904, 951 (9th Cir. 2022) (quotation marks omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

1    Importantly, "a slight misstatement of law by a prosecutor can be rendered harmless by the

2    court's proper instruction to the jury. And under Supreme Court precedent, a jury is presumed to

3    follow the trial court's instructions." *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citation

4    modified).  However, "improper prosecutorial statements cannot be neutralized by instructions

5    that do not in any way address the specific statements of the prosecutor." *Id.* at 980 (citation

6    modified).

7           Here, the state appellate court reasonably concluded that while the prosecutor misstated

8    the law regarding the heat of passion defense, any error was harmless because the trial court

9    correctly instructed the jury on the defense.  (Doc. No. 12-16 at 16-17).  *See Hampton v. Shinn*,

10   143 F.4th 1047, 1089 (9th Cir. 2025) ("Improper prosecutorial argument generally should not

11   result in reversal where the trial court instructed the jury that closing arguments are not

12   evidence.").  The state appellate court also reasonably determined that the prosecution's

13   additional challenged statements did not amount to misconduct.  (Doc. No. 12-16 at 20-24).

14   Further, the appellate court concluded Petitioner was not prejudiced by any error because the

15   evidence—including video showing Petitioner initiating the fight with Jones, reaching for a

16   concealed handgun after Jones fell against a wall, and firing multiple times at Jones, who never

17   displayed a weapon—"conclusively established appellant's express malice to commit murder."

18   (Doc. No. 12-16 at 17).  *See Darden*, 477 U.S. at 182 (overwhelming evidence of guilt reduced

19   the likelihood that the jury's decision was influenced by any improper argument).

20          Petitioner has not shown that the state court's determination of his prosecutorial

21   misconduct claims was contrary to, or an unreasonable application of, clearly established federal

22   law, or that it was an unreasonable determination of the facts in light of the evidence presented.

23   Accordingly, the undersigned recommends that Petitioner be denied relief on Ground Two.

24          **B.      Ground Three-Jury Coercion**

25          Petitioner also argues the trial court deprived him of his Fourteenth Amendment right to a

26   unanimous jury and a fair trial by giving the jury a coercive deadlock-breaking instruction.  (Doc.

27   No. 1 at 29).

28          ////

1          **1.  State Court Decision**

2          The state appellate court rejected Petitioner's challenge to the deadlock breaking

3     instruction, explaining:

4              The jury twice informed the trial court that it was unable to reach a
              verdict. Appellant argues that the trial court coercively instructed
5              the jury the second time to continue deliberating.

6          ***A. Background.***

7              From February 4 through February 11, 2019, the jury heard
              testimony in this matter. On February 13, 2019, the parties gave
8              closing arguments. At 3:30 p.m. that day, the jury began
              deliberating.
9

10             On the morning of February 15, 2019, the jury announced it had
              unanimously agreed appellant was not guilty of first degree murder.
11             The jury, however, stated it could not reach any further agreement.
              The court asked for a numerical split. The foreperson responded,
12             "8/4, 9/3." The court noted that the jury had deliberated throughout
              the day before and it had spent over two hours deliberating that
13             morning before communicating with the court. The court said it
              wanted the jury to deliberate further and try to reach a unanimous
14             verdict, if it was possible.

15             The court instructed the jurors with CALCRIM No. 3551. It offered
              certain suggestions to them, such as not hesitating "to reexamine
16             your own views." The court cautioned the jurors not to change their
              individual positions just because it differed from another's position,
17             "or just because you or others want to reach a verdict." The jurors
              were told that both parties were entitled to an individual judgment
18             from each juror.

19             That same afternoon, the jury formally returned a not guilty verdict
              for first degree murder. It announced it was still deadlocked
20             regarding second degree murder. The foreperson reported a new
              "7/5" split. The court polled the individual jurors about whether a
21             unanimous verdict could be reached if the jurors were offered the
              possibility of further readback or instructional guidance. The court
22             received mixed responses. Five jurors agreed that this could make a
              difference. However, four jurors said "No" and the remaining three
23             jurors said that this could "possibly" make a difference.

24             The court directed the jury to return on February 19, 2019, a
              Tuesday, and resume deliberations. The court noted that Monday
25             was "President's Day." The court told the jurors to "take the
              weekend to clear your minds" and to come back on Tuesday
26             morning with "a fresh set of eyes and ears" and see if something
              might assist them in reaching a unanimous verdict. The court stated
27             it and the parties would do their best to provide the jury with
              anything it needed. "Otherwise, I want you to continue to deliberate
28             and see if there is a dialogue that will allow you to arrive at a
              unanimous verdict." The court acknowledged the "difficult job"

23

before the jury. The court stated it hoped the "long weekend will give you an opportunity to reassess your positions and your approach and perspective to the job, and we'll see where we stand come Tuesday, okay." The court excused the jury.

On the morning of February 19, 2019, the jury resumed deliberations at about 9:15 a.m. At about 10:55 a.m., it announced it had reached a unanimous guilty verdict of second degree murder. It found true that appellant intentionally discharged a firearm which caused great bodily injury or death to Jones, and that appellant personally used a firearm.

### B.  Analysis.

Appellant argues that, unlike its first instruction to the deadlocked jury, the trial court did not again caution the jurors to not change their positions just because of a difference with another person, or just because someone wanted to reach a verdict. The court also did not instruct the jurors that the parties were entitled to an individual judgment from each of them. According to appellant, the court's second instruction effectively encouraged the jurors "to consider the numerical division or preponderance of opinion" when forming or reexamining their individual views. Appellant maintains that the court's second instruction violated Supreme Court precedent, along with his due process rights. He asserts that the numerical split was growing and not lessening before the court's second instruction. Appellant argues it is reasonably probable he would have obtained a more favorable result had the court not so acted. He relies primarily on *Jiminez v. Myers* (9th Cir. 1994) 40 F.3d 976 (*Jiminez*).

Appellant's arguments and his cited authority are unpersuasive. We agree with respondent that appellant has forfeited this claim. In any event, it also fails on its merits.

### 1.  This claim is forfeited.

It is undisputed that appellant did not object when the trial court instructed the jury the second time to continue its deliberations. Appellant argues he did not have a reasonable opportunity to raise an objection because the trial court did not review its instruction with the parties before directing the jury to come back after the long weekend and continue deliberating. In the alternative, appellant contends that the court had an obligation to instruct the jury correctly. Finally, appellant raises ineffective assistance of counsel if this claim is deemed forfeited.

Respondent disagrees with appellant's characterization that the trial court's final statement to the jury amounted to a formal "instruction." However, respondent raises forfeiture if that final statement is deemed an instruction.

We need to resolve the parties' dispute regarding whether or not the trial court gave a formal "instruction" to the jury when it directed them to resume deliberating after the holiday break. Regardless of

24

how the court's statement is classified, appellant was obligated to preserve for appeal this assignment of alleged error. His failure to object below precludes his obtaining appellate relief to the extent he claims the trial court committed statutory error. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [failure to object precludes appellate relief regarding alleged statutory error committed by trial court].)

As we explain below, the trial court did not improperly coerce the jury. Thus, appellant's due process rights were not violated and appellant does not demonstrate ineffective assistance of counsel. Defense counsel was not obligated to lodge an objection that counsel reasonably determined would be futile. (*People v. Price* (1991) 1 Cal.4th 324, 387.) Consequently, this claim is deemed forfeited.

**2. This claim fails on its merits.**

In relevant part, section 1140 provides that a jury cannot be discharged without having rendered a verdict unless the trial court deems there is no reasonable probability that the jury can agree. "'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' " (*People v. Lopez* (2018) 5 Cal.5th 339, 364.)

A trial court must exercise its power under section 1140 without coercing the jury. (*People v. Lopez, supra*, 5 Cal.5th at p. 364.) A jury's independent judgment must not be displaced in favor of compromise and expediency. (*Ibid.*) Our high court has explained that " ' "[a]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." ' [Citation.]" (*Ibid.*)

In *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), disapproved on another ground in *People v. Valdez* (2012) 55 Cal.4th 82, 163, our Supreme Court held it is improper for a trial court to "appeal to dissenting jurors to abandon their own independent judgment of the case against the accused." (*Gainer*, at p. 849.) *Gainer* established prohibitions for a trial court when dealing with a deadlocked jury. Error occurs if a trial court encourages deadlocked jurors to consider the "numerical division or preponderance of opinion of the jury" when renewing deliberations. (*Id.* at p. 852.) It is also error if a trial court states or implies that the case will necessarily be retried if the jury fails to agree. (*Ibid.*)

Two Supreme Court opinions, *People v. Tarantino* (1955) 45 Cal.2d 590 (*Tarantino*) and *People v. Pride* (1992) 3 Cal.4th 195 (*Pride*) are instructive in this matter. Both *Tarantino* and *Pride* demonstrate that the trial court did not abuse its discretion in directing the jury to continue its deliberations. Before summarizing those opinions, we review appellant's cited authority, *Jiminez*.

**a. *Jiminez*.**

In *Jiminez*, the Ninth Circuit concluded that the defendant had been

denied a fair trial and his federal constitutional due process rights violated because the California state trial court had coercively directed the jury to continue deliberating. (*Jiminez*, *supra*, 40 F.3d at p. 981.) The jury twice declared it was deadlocked. Both times, the trial court inquired about the numerical split. (*Id.* at pp. 978–979.) The final split was "[e]leven- one." (*Id.* at p. 979.) The trial court stated that "substantial movement" had occurred "since the last time." The court ordered the jury to finish deliberations that day "and see where we are at that point in time." (*Id.* at p. 979.) Defense counsel objected and asked the court to inquire whether further deliberation would be fruitful. The defense also argued that "a tremendous amount of pressure" was being exerted on the lone holdout juror. (*Ibid.*) The court determined that the holdout juror would not be subjected to " 'undue pressure' " because the jury had only been asked to finish the day deliberating, which was about two more hours. (*Ibid.*) The jury returned a guilty verdict after an hour and 48 minutes of additional deliberation.

The Ninth Circuit held that "the trial court's comments and conduct amounted to giving the jury a de facto *Allen* charge, which instructs the jurors to work towards unanimity and the minority to reexamine its views." (*Jiminez*, *supra*, 40 F.3d at p. 980.) The trial court had "effectively instructed the jurors to make every effort to reach a unanimous verdict." (*Id.* at p. 981.) The trial court had elicited the progression in the voting and determined it was moving in one direction. The trial judge had expressed "his approval of that progression," and told the jury to continue its deliberations. (*Ibid.*) "In view of the disclosure after the second impasse that only one juror remained in the minority and the trial court's implicit approval of the 'movement' toward unanimity, the court's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (*Ibid.*) "The trial court's failure to counter-balance the implication of its questions and comments by instructing the hold-out juror not to surrender his or her sincere convictions strongly supports the conclusion that the jury was impermissibly coerced to render a unanimous verdict." (*Ibid.*)

### b. Tarantino.

In *Tarantino*, the defendant was indicted on one count of conspiracy to commit extortion and three counts of extortion. (*Tarantino*, *supra*, 45 Cal.2d 590 at p. 592.) The jury deliberated from the morning of December 18 through the evening of December 22 before rendering guilty verdicts on all four counts. (*Id.* at p. 599.) During that span, the jury alerted the trial court at least twice that it could not reach agreements. On December 21, and again on the late afternoon of December 22, the trial court instructed the jury to continue its deliberations. During its final discussion with the jury, which occurred at 4:30 p.m., the court stated it was the jurors' " 'duty' " to deliberate and it would violate their oaths as jurors to refuse to discuss the case further. (*Id.* at p. 600.) The court said it knew the jurors " 'have been very patient

1  and have been here a long time, and maybe tempers wear thin, but it
   is your duty to deliberate until the court excuses you.' The judge
2  pointed out that the jury need not be in agreement as to all counts
   and asked them to deliberate 'somewhat further.' At 8:45 p.m. they
3  returned with the verdicts." (*Ibid.*)

4  The Supreme Court in *Tarantino* rejected the defendant's assertion
   that the trial court had coerced the verdicts. According to the high
5  court, the trial court never suggested what verdicts should be
   reached and it did not impose any improper pressure upon the jury
6  to agree. (*Tarantino*, *supra*, 45 Cal.2d at p. 600.) The trial court did
   not require the jury "to prolong their deliberations unduly,
7  particularly in view of the fact that the trial had consumed 44 days."
   (*Ibid.*) The Supreme Court found no judicial coercion. (*Ibid.*)

8
                        c.  *Pride.*
9
10  In *Pride*, the defendant was sentenced to death following
    convictions for two murders. (*Pride*, *supra*, 3 Cal.4th at p. 213.)
11  During the penalty phase, the jury deliberated for more than an
    entire week, and its vote apparently remained at 11 to 1 for most of
12  that time. (*Id.* at p. 265.) The foreperson "publicly suggested the
    minority juror was breaching his or her duty to impose the
13  appropriate penalty." (*Ibid.*) On appeal, the defendant argued that
    the trial court had coerced the verdict by ordering deliberations to
14  continue. (*Ibid.*) According to the defendant, the trial court had
    impliedly agreed with the foreperson's assessment. Our Supreme
15  Court rejected these arguments. (*Ibid.*)

16  Citing section 1140 and various Supreme Court precedents, *Pride*
    held that a trial court "may ask jurors to continue deliberating
17  where, in the exercise of its discretion, it finds a 'reasonable
    probability' of agreement." (*Pride*, *supra*, 3 Cal.4th at p. 265.) The
18  trial court had "avoided any comment on the status of the vote and
    strongly suggested it was irrelevant. The jury was never told it must
19  reach a verdict, nor were any other constraints placed on their
    deliberations." (*Id.* at pp. 265–266.) The high court found it
20  persuasive that, a few days earlier, the trial court had reread the
    instruction describing the individual nature of the penalty
21  determination. In addition, the trial had been lengthy and complex.
    As such, "the direction to continue deliberations could only have
22  been perceived as giving jurors an opportunity to enhance their
    understanding of the case, rather than as pressure to reach a
23  verdict." (*Id.* at p. 266.) Finally, two jurors had told the trial court
    that they believed a verdict might be reached, and no juror said a
24  unanimous agreement was impossible. The Supreme Court
    concluded that the trial court had not coerced a verdict or abused its
25  discretion under section 1140. (*Pride*, at p. 266.)

26
                   d.  *The present matter.*
27
    In this matter, the trial court asked the jurors to "take the weekend
28  to clear your minds" and to come back on Tuesday morning with "a
    fresh set of eyes and ears" and see if something might assist them in
    reaching a unanimous verdict. The court stated that the jury would

27

be provided with anything it needed. "Otherwise, I want you to continue to deliberate and see if there is a dialogue that will allow you to arrive at a unanimous verdict." The court's comments comply with California Rules of Court, rule 2.1036, which permits a trial court to remind a jury at an impasse "of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict."

We conclude that the trial court did not abuse its discretion. The court never stated or implied that this case would be retried if the jury failed to reach an agreement. The court never suggested to the jurors that they should reconsider their views in light of the numerical breakdown of the votes. Thus, the trial court did not violate the prohibitions announced in *Gainer*. (See *Gainer*, *supra*, 19 Cal.3d at p. 852.)

When the first deadlock was discussed, the trial court cautioned the foreperson to provide only the numerical breakdown and not to disclose how the jurors were split. "This directive communicated to the jury that the court was not concerned with the direction of the voting." (*People v. Brooks* (2017) 3 Cal.5th 1, 90.) Although the trial court instructed the jurors to continue deliberating a second time, the court did so only after polling the individual jurors and receiving some positive feedback that further deliberations could be fruitful. Our Supreme Court has approved of this approach. (See *People v. Lopez*, *supra*, 5 Cal.5th at p. 364 [noting with approval that the trial court questioned "individual jurors on whether he or she believed the jury was deadlocked and whether the court could do anything to assist the process"].) Indeed, *Pride* held that a trial court "may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*Pride*, *supra*, 3 Cal.4th at p. 265.)

Unlike in *Jiminez*, the trial court did not express any approval regarding how the numerical split was progressing. The court also did not impliedly direct the jurors to abandon their respective positions just to reach unanimity. Instead, the court asked the jurors to "see if there is a dialogue that will allow you to arrive at a unanimous verdict." The court acknowledged the "difficult job" before the jury, and it hoped the long weekend would give the jurors an opportunity "to reassess your positions and your approach and perspective to the job." *Jiminez* is distinguishable and it does not dictate reversal.

Finally, the trial court never suggested what verdict the jurors should reach. As in *Tarantino*, the court did not require the jury to unduly prolong its deliberations, and the court did not impose improper pressure on the jury to reach an agreement. Similar to *Pride*, the court never told the jury it must reach a verdict, and it did not place any constraints on their deliberations. Instead, the court invited the jury to seek additional resources if needed and "we'll see where we stand come Tuesday, okay." Both *Tarantino* and *Pride* support affirming the trial court's decision. Judicial coercion

1    did not occur.

2    (Doc. No. 12-16 at 25-34 (footnotes omitted)).

3                **2.  Federal Habeas Analysis**

4          In challenging the trial court's deadlock breaking instruction, Petitioner once again fails to

5    engage with the state court's analysis or present any argument as to why the state court's decision

6    is contrary to, or an unreasonable application of, Supreme Court precedent or based on an

7    unreasonable determination of the facts.  (*See* Doc. No. 1 at 29-31).  Respondent argues that

8    beyond being procedurally barred, Petitioner's claim was reasonably rejected by the state

9    appellate court and "[n]o controlling Supreme Court precedent dictates reversal in a case like

10   Petitioner's."  (Doc. No. 13 at 34).

11         "Any criminal defendant … being tried by a jury is entitled to the uncoerced verdict of

12   that body."  *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  "Whether the comments and

13   conduct of the state trial judge infringed defendant's due process right to an impartial jury and a

14   fair trial turns upon whether the trial judge's inquiry would be likely to coerce certain jurors into

15   relinquishing their views in favor of reaching a unanimous decision."  *Jiminez v. Myers*, 40 F.3d

16   976, 979 (9th Cir. 1993) (quotation marks omitted).  "A supplemental jury charge to encourage a

17   deadlocked jury to try and reach a verdict is not coercive per se."  *Parker v. Small*, 665 F.3d

18   1143, 1147 (9th Cir. 2011).  Rather, "[c]oercion can occur when, for example, a district court tells

19   a jury that it must reach a decision, a district court polls a jury before it reaches a verdict, or a

20   special verdict form reformulates the elements of the crime."  *United States v. McCaleb*, 552 F.3d

21   1053, 1057-58 (9th Cir. 2009) (citation modified).  "[W]hen faced with a claim of jury coercion, a

22   reviewing court must 'consider the supplemental charge given by the trial court "in its context

23   and under all the circumstances."  *Parker*, 665 F.3d at 1147 (quoting *Lowenfield*, 484 U.S. at

24   237).

25         Here, the state appellate court properly considered the supplemental instruction in context

26   and in light of all the circumstances.  The appellate court observed that the trial court properly

27   encouraged the jury to clear their minds and look at the case fresh to see if anything might assist

28   them in reaching a verdict, and reminded the jury of its duty to continue to attempt to arrive at a

1  verdict.  (Doc. No. 12-16 at 32; *see* Doc. No. 12-16 at 10-12, 18-19).  The appellate court further

2  concluded that by advising the foreman to only provide the numerical breakdown without

3  disclosing how the jury was split, the trial court communicated that it was not concerned with the

4  direction of the voting and did not suggest that jurors should reconsider their views based on the

5  numerical breakdown of their votes.  (Doc. No. 12-16 at 33; *see* Doc. No. 25-1 at 9).  Further, the

6  trial court provided the second order to continue deliberations only after polling the jurors as to

7  whether further deliberations could be fruitful and receiving positive feedback.  (Doc. No. 12-16

8  at 33; *see* Doc. No. 25-1 at 16-18).  Because the trial court never suggested what verdict the jury

9  should reach, never told the jury it was required to reach a verdict, and did not place any

10  constraints on the deliberations, no judicial coercion occurred.

11       Petitioner has failed to demonstrate that the state appellate court's rejection of the jury

12  coercion claim was contrary to, or an unreasonable application of Supreme Court precedent, or

13  based on an unreasonable determination of the facts.  Accordingly, the undersigned recommends

14  Petitioner be denied relief on Ground Three.

15       **C.       Ground One-Ineffective Assistance of Counsel**

16       Petitioner argues he received ineffective assistance of counsel based on counsel's failure

17  to object to the prosecution's improper closing argument and the deadlock breaking instruction.

18  (Doc. No. 1 at 32).

19       **1.  State Court Decision**

20       The state appellate court rejected Petitioner's ineffective assistance claim as follows:

21          Appellant raises a claim of ineffective assistance of counsel. He
22          argues that his counsel failed to object during the prosecutor's
            closing arguments, and his counsel failed to object to the trial
23          court's instruction that directed the jury to continue deliberations a
            second time. According to appellant, his counsel also misstated the
24          law regarding heat of passion during the defense's closing
            argument.

25          Accompanying this appeal, appellant has filed a petition for writ of
            habeas corpus. In the petition, he contends his trial counsel was
26          ineffective in failing to object to the instances of purported
            misconduct during closing argument, and in failing to object to the
27          court's instruction directing the jury to continue deliberations a
            second time. He also argues that his trial counsel failed to ask for
28          the media to be excluded when the jury was told to continue its

30

deliberations. According to appellant, he filed the petition "to allow for expansion of the record through an evidentiary hearing."

We reject appellant's claim of ineffective assistance of counsel. We likewise summarily deny the companion petition for a writ of habeas corpus.

Under the federal and state Constitutions, a criminal defendant is entitled to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel on direct appeal, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas, supra*, 12 Cal.4th at p. 436.) In conducting this review, the appellate court considers whether the record contains any explanation for counsel's actions; if the record sheds no light on counsel's actions, the claim is not cognizable unless counsel was asked for an explanation and failed to provide one, or unless there could be no satisfactory explanation for the actions taken. (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Likewise, a habeas corpus petitioner must prove facts by a preponderance of the evidence that establish a basis for relief. A petitioner must establish either (1) that, because of defense counsel's performance, "the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations]; or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations.]" (*In re Visciotti* (1996) 14 Cal.4th 325, 351–352.)

In the present matter, we have already explained that the prosecutor either did not commit misconduct during closing arguments and/or any misstatement of law was harmless. We have also already concluded that the trial court did not coercively direct the jury to continue deliberations after it announced it was deadlocked. As such, appellant does not demonstrate ineffective assistance of counsel. Appellant fails to show that his counsel's failure to raise objections to these disputed points fell below an objective standard of reasonable competence. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price, supra*, 1 Cal.4th at p. 387.) "Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments." (*People v. Ghent, supra*, 43 Cal.3d at p. 773.)

Moreover, appellant has not established that he was prejudiced. As we have already explained, it is not reasonably probable a more

favorable result would have occurred had the prosecutor not made her disputed comments. Thus, appellant does not meet his burden of establishing any resulting harm even if his counsel should have raised objections.

Finally, we reject appellant's assertion that his trial counsel prejudicially misstated the law regarding heat of passion. During closing argument, defense counsel asserted that "someone from a very wealthy neighborhood" might not believe it was reasonable to shoot Jones. However, counsel argued that the jurors had to "look at the situation" and counsel began to suggest that it was appropriate to consider how a person from this particular neighborhood would have acted. The prosecutor objected, contending that defense counsel's argument misstated the law. The trial court overruled that objection, and it admonished the jury that it was to rely on the legal instructions provided by the court. Based on the admonishment given to the jury, along with the proper legal instructions regarding heat of passion, any potential misstatement of law by defense counsel was harmless.

Based on this record, appellant does not demonstrate ineffective assistance of counsel. We will summarily deny the companion petition for a writ of habeas corpus because appellant does not prove facts by a preponderance of the evidence that establishes a basis for relief. This claim on direct appeal is likewise without merit.

(Doc. No. 12-16 at 34-37 (footnotes omitted)).

**2.  Federal Habeas Analysis**

While Petitioner presents argument that his counsel rendered deficient performance that was prejudicial to Petitioner, he once again fails to engage with the state appellate court's analysis and rejection of this claim. (*See* Doc. No. 1 at 32-35). Petitioner argues that he did not have a reasonable opportunity to develop the record in state court and he should be allowed an opportunity to examine his counsel's reasons, if any, for failing to raise the various objections. (*Id.* at 35). Respondent argues the state appellate court reasonably rejected each of Petitioner's ineffective assistance claims under the applicable federal standard. (Doc. No. 13 at 44-45).

Criminal defendants have a right to counsel at trial and on direct appeal. U.S. Const. Amend VI. Claims alleging that trial or appellate counsel were constitutionally ineffective require the Court to engage in the two-step analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong of that test, the petitioner must prove that his attorney's representation fell below an objective standard of reasonableness. *Id.* at 687-88.

1    To demonstrate deficient performance, the petitioner must show his counsel "made errors so

2    serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

3    Sixth Amendment." *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing

4    trial counsel's performance, however, "counsel is strongly presumed to have rendered

5    adequate assistance and made all significant decisions in the exercise of reasonable

6    professional judgment."  *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8

7    (2003).  Only if counsel's acts and omissions, examined within the context of all the

8    circumstances, were outside the "wide range" of professionally competent assistance, will

9    petitioner meet this initial burden.  *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986);

10    *Strickland*, 466 U.S. at 689-90.

11        Under the second part of *Strickland's* two-prong test, the petitioner must show that he

12    was prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a

13    reasonable probability that, but for his counsel's errors, the result would have been different.

14    *Id*.  The errors must not merely undermine confidence in the outcome of the trial but must

15    result in a proceeding that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17;

16    *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must prove both prongs:

17    deficient performance and prejudice.  A court need not, however, determine whether

18    counsel's performance was deficient before determining whether the petitioner suffered

19    prejudice as the result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697 ("If it is easier

20    to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

21    expect will often be so, that course should be followed.").

22        Here, the state appellate court concluded that because Petitioner's underlying claims

23    of prosecutorial misconduct and jury coercion failed, he could not show that counsel

24    performed deficiently by failing to raise objections to these issues.  (Doc. No. 12-16 at 36).

25    Further, the appellate court concluded that Petitioner had not shown prejudice because it was

26    "not reasonably probable a more favorable result would have occurred had the prosecutor not

27    made her disputed comments."  (*Id.*).  Thus, the state appellate court concluded Petitioner

28    failed to satisfy either prong of the *Strickland* standard for the prosecutorial misconduct

33

1    claim and the first prong for the jury coercion claim.

2          Above, the undersigned has already concluded that the state appellate court

3    reasonably rejected Petitioner's prosecutorial misconduct and jury coercion claims.  Because

4    these underlying claims are meritless, Petitioner cannot show that his council performed

5    deficiently in failing to object "because trial counsel cannot have been ineffective for failing

6    to raise a meritless objection." *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).  Thus,

7    Petitioner cannot satisfy the first prong of the *Strickland* standard, and his ineffective

8    assistance claim necessarily fails.

9          Accordingly, the state appellate court's rejection of Petitioner's ineffective assistance

10   claim was not contrary to, or an unreasonable application of, Supreme Court precedent or

11   based on an unreasonable determination of the facts.  The undersigned recommends

12   Petitioner be denied relief on Ground One.

13               **V.    CERTIFICATE OF APPEALABILITY**

14         A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

15   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

16   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

17   district court to issue or deny a certificate of appealability when entering a final order adverse to a

18   petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

19   Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

20   showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires

21   the petitioner to show that "jurists of reason could disagree with the district court's resolution of

22   his constitutional claims or that jurists could conclude the issues presented are adequate to

23   deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

24   *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

25   the denial of a constitutional right, the undersigned recommends that the court decline to issue a

26   certificate of appealability.

27         Accordingly, it is **RECOMMENDED**:

28         1.  Petitioner be DENIED all relief on his petition for writ of habeas corpus (Doc. No. 1);

1    and

2        2.  Petitioner be denied a certificate of appealability.

3                           **NOTICE TO PARTIES**

4    These Findings and Recommendations will be submitted to the United States District Judge

5    assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

6    being served with a copy of these Findings and Recommendations, a party may file written

7    objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

8    "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

9    **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

10   wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

11   CM/ECF document and page number, when possible, or otherwise reference the exhibit with

12   specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

13   the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

14   636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

15   waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

16

17   Dated:    October 28, 2025

18                                          HELENA M. BARCH-KUCHTA
                                            UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26

27

28